UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


LIOBAR ESTUPINAN,


v.                          Case No. 8:05-cr-240-T-24MSS
                                       8:06-cv-1866-T-24MSS

UNITED STATES OF AMERICA.
_____

O R D E R

This cause is before the Court on Defendant Liobar Estupinan's amended motion

to vacate, set aside, or correct an allegedly illegal sentence pursuant to 28 U.S.C. § 2255

(Doc cv-4;cr-136).


BACKGROUND

On August 3, 2005, Estupinan pled guilty, pursuant to a written plea agreement, to

count two of a two-count indictment, which charged Estupinan with conspiracy to possess

with intent to distribute five kilograms or more of cocaine while on board a vessel subject

to the jurisdiction of the United States, in violation of 46 Appendix, U.S.C. § § 1903(a),

1903(g), and 1903(j); 21 U.S.C. 960(b)(1)(B)(ii). (Doc. cr-55 [Plea Agreement]; cr-140

[Change of Plea Hearing]; cr-96 [Judgment]).

The written plea agreement contained an appeal waiver that read:

> The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence or to challenge it collaterally on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the Government exercises its right to appeal the sentence imposed, as authorized by Title 18, United States Code, Section 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by Title 18, United States Code, Section 3742(a).

(Doc. cr-55 at 13). On November 18, 2005, the Court sentenced Estupinan to one hundred and twenty-one months incarceration as to count two of the indictment. (Doc. cr-96) Count one was dismissed on the Government's motion. Judgment was entered that day, November 18, 2005. (Doc. cr-96) Estupinan did not appeal the conviction or sentence.

On September 25, 2006, Estupinan signed a timely motion to vacate. The Court ordered Estupinan to file an amended motion to vacate, which he did, on January 26, 2007, raising four grounds for relief. A review of the record in this case demonstrates that, for the following reasons, Estupinan's motion to vacate must be **DENIED**.

Discussion

Ground One

Estupinan alleges that his counsel was ineffective for failing to (A) explain the consequences of a guilty plea; (B) request an evidentiary hearing; (C) present a downward department for collateral consequences pursuant to 18 U.S.C.§ 3553(a) and (b), USSG § 5K2.0(a)(1), (2), (3), and (4); (D) argue against the mandatory sentencing scheme that is

now unconstitutional; (E) attain a minor or minimal role as promised and to receive any leniency or benefits for entering into a plea agreement that yielded no benefits; and (F) request proof of criminal jurisdiction, subject matter jurisdiction, territorial jurisdiction and exclusive jurisdiction. (Amended Motion To Vacate, Doc. cv-4 at p. 5).

Standard of Review for Effective Assistance of Counsel

To prevail on a claim alleging ineffective assistance of counsel, Estupinan must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s two-part test requires a defendant to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the Court need not make a ruling on the performance component.

The two-pronged *Strickland* test is applicable to ineffective assistance of counsel claims arising out of the plea process. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985). Counsel owes a lesser duty to a client who pleads guilty than to one who goes to trial. When a client pleads guilty, counsel need only provide his client with an understanding of the law in relation to the facts, so that the defendant may make an informed and conscious choice between accepting the prosecution's offer and going to trial. *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984). To impart such an understanding to the accused, counsel must make an independent examination of the facts, circumstances, pleadings and laws involved, and then offer counsel's informed opinion as to the best course to be followed in protecting the interests of the client.

The second prong of the *Strickland* test focuses on whether counsel's alleged

constitutionally ineffective performance affected the outcome of the plea process.  *Hill*, 474 U.S. at 59.   In other words, in order to satisfy the prejudice requirement, the defendant claiming ineffective assistance of counsel during the plea process must show that there is a reasonable probability that, but for counsel's alleged errors, the defendant would not have pled guilty and would have insisted on going to trial. *Id.*

Estupinan's Claims

First, Estupinan alleges that counsel was ineffective for failing to explain the consequences of a guilty plea. In his original motion to vacate (Doc. cv-1), Estupinan phrased this claim as "The defendant argues that his lawyer failed in his obligatory duties in that he did not explain the consequences of a plea agreement prior to its signing."  If what Estupinan means is that his attorney did not go over the plea agreement with him prior to his signing it, this claim has no merit.   At the change of plea hearing, after interpreter Pedro Marino and Estupinan were sworn, Estupinan stated that he had signed the plea agreement voluntarily (Doc. cr-140 at p. 9) after the plea agreement was read to him in Spanish. He stated that he understood all of the terms in the plea agreement. (Doc. cr-140 at p. 10).

If, on the other hand, Estupinan is contending that his counsel was ineffective for failing to explain the consequences of the guilty plea, his claim fails because Estupinan cannot show prejudice.  The United States Magistrate Judge went over the entire plea agreement with Estupinan, paragraph by paragraph.  She explained the meaning of each paragraph and explained the ramifications of Estupinan's pleading guilty. (Doc. cr-140 at pp. 10-20).  The Magistrate Judge explained the rights Estupinan was giving up by pleading

guilty, including the right to a trial by jury. (Doc. cr-140 at pp. 28).[1]

Estupinan swore that no one had promised him anything "to get you to give up your right to jury trial other than what is in this plea agreement." (Doc. cr-140 at p. 28). After the prosecutor presented the facts to support the charge against Estupinan, Estupinan agreed that the facts were true. (Doc. cr-140 at pp. 28-32). He swore that he did not have any questions about the consequences of pleading guilty. (Doc. cr-140 at p. 32). Finally, Estupinan pled guilty and swore that he was pleading guilty because he was guilty. (Doc. cr-140 at p. 34). This claim does not warrant relief.

Next, Estupinan alleges that his counsel was ineffective for failing to request an evidentiary hearing. This claim has no merit. Estupinan has not alleged any issues on which an evidentiary hearing would have been necessary or appropriate. The Court held two hearings in this case: a change of plea hearing at which Estupinan pled guilty and a sentencing hearing. (Doc. cr-140, 132). Estupinan had an opportunity to speak, through his sworn interpreter, at both hearings. He did not request any type of evidentiary hearing at either hearing, and he has not alleged any legal issues the Court should have addressed in an evidentiary hearing. This claim does not warrant relief.

Next, Estupinan alleges that his counsel was ineffective for failing to present a downward departure for collateral consequences pursuant to 18 U.S.C. § 3553(a) and (b), USSG § 5K2.0(a)(1)-(4). This claim has no merit because even if counsel had argued at sentencing for a downward departure for collateral consequences pursuant to 18 U.S.C.

---

[1] After the Magistrate Judge had explained what giving up the right to trial by jury meant, Estupinan said he "didn't understand it too well." (Doc. cr-140 at p. 25). The Magistrate Judge again explained what a right to trial by jury entailed and Estupinan stated that he understood and wished to give up his right to jury trial and plead guilty. (Doc. cr-140, pp. 25-28).

§ 3553(a) and (b), USSG § 5K2.0(a)(1)-(4), the argument would have been unsuccessful. (See case law, *infra*, in grounds three and four). Estupinan cannot fault his counsel, and cannot show that he was prejudiced under the *Strickland* standard, for counsel's not presenting "a downward departure [argument] for collateral consequences." Furthermore, the Court specifically stated that it considered the 18 U.S.C. § 3553 factors in sentencing. (Doc. cr-132 at p. 18).  This claim does not warrant relief.

Next, Estupinan alleges that his counsel was ineffective for failing to argue against the mandatory sentencing scheme that is now unconstitutional.  This claim also has no merit.  In *United States v. Booker*, 543 U.S. 220 (2005), the United States Supreme Court held that the sentencing guidelines were advisory.  Estupinan stated that his attorney had reviewed the Presentence Investigation Report (PSR) with him.  Paragraph 13, page 3 of the PSR reads:

> 13.   The Probation Office used the November 1, 2004 edition of the <u>Guidelines Manual</u> in determining the applicable guideline range.  In accordance with <u>United States v. Booker and Fantan</u>, the Court must consider the advice of, but is not bound by, the federal sentencing guidelines. In determining the particular sentence to be imposed, the Court will also take into account the factors listed in 18 U.S.C. § 3553(a).[2]

Estupinan was aware that he was being sentenced pursuant to <u>advisory</u>, not mandatory guidelines. It was not ineffective for counsel not to argue against an unconstitutional mandatory sentencing scheme in Estupinan's case because the Court

---

[2] After *United States v. Booker*, 543 U.S. 220 (2005), a district court must calculate correctly the advisory Sentencing Guidelines range and then, using the section 3553(a) sentencing factors, the court can impose a more severe or more lenient sentence as long as it is reasonable. *United States v. Crawford*, 407 F.3d 1174, 1179 (11th Cir.2005). A sentence within the advisory guidelines range is not per se reasonable, *United States v. Talley*, 431 F.3d 784, 786 (11th Cir.2005); but "ordinarily we would expect a sentence within the Guidelines range to be reasonable." *Id.* at 788. Reasonableness review is "deferential." *Id.*

knew the guidelines were advisory. The PSR clearly states that the guidelines were advisory, not mandatory.   Furthermore, the Court reiterated, at sentencing, that the guidelines were advisory.

Next, Estupinan alleges that counsel was ineffective for failing to "attain a minor or minimal role as promised and to receive any leniency or benefits for entering into a plea agreement that yielded no benefits."   This claim also has no merit.   Estupinan has not alleged any facts to support his claim that he was promised a minor or minimal role for pleading guilty.   At the change of plea hearing, Estupinan, under oath, stated that no one had promised him anything in exchange for signing the plea agreement "other than what is in the document." (Doc. cr-140 at p. 10).   He stated that no one had promised him anything in exchange for his giving up his right to appeal. (Doc. cr-140 at p. 20).   He also stated that no one had told him exactly what his sentence would be if he entered a plea (Doc. cr-140 at p. 20), and that no one had made any promise about the sentence "that you're relying upon in entering a plea in this case." (Doc. cr-140 at p. 21).   Estupinan stated that no one had promised him anything to get him to give up his right to jury trial other than what was in the plea agreement, and that no one had threatened him to "give up your right to jury trial."   (Doc. cr-140 at p. 28). The plea agreement does not contain any language promising Estupinan a minor role.   Counsel argued, at sentencing, that Estupinan was entitled to a minor role, but was unsuccessful in his argument.

Contrary to Estupinan's contention, he did receive a benefit for entering into the plea agreement.   In paragraph 9 of the plea agreement, the Government stated that, at sentencing, it would not oppose Estupinan's request for a two level downward departure for acceptance of responsibility, pursuant to USSG § 3E1.1(a). In addition, the Government

stated that, if Estupinan complied with the provisions of USSG § 3E1.1(b), the Government would move for a downward adjustment of one additional level.  In addition, in paragraph 10 of the plea agreement, the Government stated that, at sentencing, the Government would not oppose Estupinan's request that he receive a sentence at the low end of the applicable guidelines range.  In addition, at sentencing, the Court stated that Estupinan's entering into a plea agreement and waiving his right to appeal was a major factor in his receiving  a sentence 14 months below the advisory guideline range:

> . . . it is the judgment of this Court, Mr. Liobar Estupinan, that you be sentenced to 121 months in the Bureau of Prisons.[3]

> The 121 months reflects my opinion that you should be given some credit for having pled pursuant to a plea agreement in which you waived your right to appeal.

> And with that said, I am not in any way suggesting that I have not considered the advisory guidelines, and I have not considered 3553;  I think it is a consideration that I can take into account under 3553, and so I am doing so.

(Doc. cr-132 at p. 18).

Estupinan has not shown that his attorney was ineffective for failing "to attain a minor or minimal role as promised" and "to receive any leniency or benefits for entering into a plea agreement that yielded no benefits."  This claim does not warrant relief.

Finally Estupinan alleges that his counsel was ineffective for failing to request proof of criminal jurisdiction, subject matter jurisdiction, territorial jurisdiction and exclusive jurisdiction.  This claim has no merit.  The factual basis in the written plea agreement contained the following paragraph:

---

[3] This is a non-guideline sentence that is essentially one level less than the advisory guidelines.

The four crew members on the go-fast then began removing their clothes and jettisoning objects overboard. The crew was observed attempting to set fire to the go-fast using a flare before jumping overboard. All four crewmembers [sic] were eventually secured in a liferaft [sic] and then transferred to the USCGC CHASE for medical evaluation. None of the crew members claimed to be the master of the vessel, nor did anyone claim nationality for the vessel. As such, the go-fast was assimilated to be stateless, that is a vessel without nationality, and therefore, subject to the jurisdiction of the United States.

(Doc. cr-55 at p. 16) Estupinan initialed page 16 of the plea agreement and signed the plea agreement.[4]

Furthermore, at the change of plea hearing, the prosecutor read the facts that supported count two of the indictment. (Doc. cr-140 at pp. 29-32). Estupinan admitted that the facts were true. (Doc. cr-140 at p. 32). Subsequently, the Magistrate Judge asked:

Mr. Liobar Estupinan, would you please stand. Sir, how do you plead to Count Two of the Indictment which charges you with conspiracy to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine while on board a vessel subject to the jurisdiction of the United States in violating of Title 46, Appendix, United States Code, Sections 1903A [sic] and 1903G [sic]?

(Doc. cr-140 at p. 34) (Emphasis added).

Estupinan pled guilty, admitting that the vessel, and he, were subject to the jurisdiction of the United States. (Doc. cr-140 at p. 34). Estupinan cannot fault his counsel for failing to challenge jurisdiction when Estupinan admitted, by pleading guilty in open court, that the Court had jurisdiction. (Doc. cr-140 at p. 34).

Because none of Estupinan's ineffective assistance of counsel claims have merit, ground one does not warrant relief.

---

[4] The last paragraph of the plea agreement reads: "The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms." (Doc. cr-55 at p. 17).

Ground Two

Estupinan alleges that a departure for minor role is warranted.  First, this claim is not a 28 U.S.C. § 2255 issue.  *See United States v. Ryan,* 289 F.3d 1339 (11th Cir. 2002). Second, the claim has no merit.  Estupinan was not entitled to a minor role reduction.

Section 3B1.2(b) of the United States Sentencing Guidelines allows for a two-level reduction in a defendant's base offense level if the sentencing court determines that the defendant was a minor participant in the offense. A minor participant is a participant "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2(b), comment. (n.5.). In *United States v. De Varon*, 175 F.3d 930 (11th Cir.1999), the Eleventh Circuit set out two measurements that inform the sentencing court's mitigating-role-in-the-offense determination: (1) the defendant's role against the relevant conduct for which he has been held accountable; and (2) the defendant's role as compared to that of other participants in his relevant conduct. *Id.* at 940. About the first measurement, De *Varon* counsels that "[o]nly if the defendant can establish that [he] played a relatively minor role in the conduct for which [he] has already been held accountable-not a minor role in any larger criminal conspiracy-should the district court grant a downward adjustment for minor role in the offense." *Id.* at 944. About the second measurement, *De Varon* counsels that this relative culpability inquiry includes "only those participants who were involved in the relevant conduct attributed to the defendant. The conduct of participants in any larger criminal conspiracy is irrelevant." *Id.* The first measurement is the more important and, in many cases, may end the inquiry. *Id.* at 945.

In Estupinan's case, the record supports the Court's decision to deny his request for a minor-role reduction. At the sentencing hearing, counsel argued for a minor role reduction

and the Court asked the prosecutor to respond:

[PROSECUTOR MS. CROFF] : Uh, in this case, Your Honor, all that we do have is nearly three tons of cocaine, and uh, Mr. Estupinan was one of the four crew members on board the go-fast that assisted in transporting that.

No, he was not the captain, uh, his brother was the captain, and he received a -- a two-level upward departure for that role.

Uh, there's nothing that makes Mr. Liobar Estupinan any less capable [sic] than the other crew members on board that vessel, the other two mariners on board that vessel.

THE COURT:  Could you address Mr. Crawford's suggestion -- and this is true on some, it's not true on all that I've had -- that he's not the mechanic, and he's not the drug guard or load guard, or whatever we've decided to call that particular person.

MS. CROFF:  Yes, Your Honor.

Uh, to our knowledge there was no one individual specifically assigned to guard that cocaine, that was a -- kind of a collateral duty I suppose of the -- of the captain of the vessel, [sic] he was charged with captaining it as well as, uh, you know, of assuming responsibility for the cocaine and that would have been Manuel.

Uh, with regard to the mechanic, uh, I believe the mechanic, uh, was Mr. Redis Mina, uh, that we learned, but Mr. Liobar Estupinan was a -- was a mariner, uh, as was, uh, the defendant just sentenced, Mr. Jose Soliman.

All four of these members, however, did assist at the beginning of their journey in somewhere around Buenaventura with transporting the go-fast to an inlet, uh, then helping load all 118 bales of cocaine on board that vessel and driving it across the eastern Pacific Ocean.

When they were spotted, uh, attached to the fishing vessel CRISMAR refueling.  Uh, Mr. Crawford's chain of events is a little different from what the Coast Guard relays, uh, and if I could I can read directly from the Coast Guard situational report as to what the Coast Guard members observed that day.  Uh, and there's a lot of acronyms in here, [sic] I'll try to work around them.

THE COURT: There's a lot of what?

11

MS. CROFF:  Acronyms.  Military acronyms, and it makes it difficult to read.

THE COURT: Thank you.

MS. CROFF:  Uh, but when the go-fast was spotted, as I said, it was alongside the fishing vessel CRISMAR.  Uh, the go-fast then got underway with the helicopter pursuing it, and the, uh, they did stop briefly.

The over-the-horizon boat that the Coast Guard had was then launched to go aboard the go-fast.  The go-fast got underway once again, uh, causing the -- over-the-horizon boat, or small boat, to be recovered on board the cutter, uh, until the helicopter could then fire disabling -- or warning shots to cause the go-fast to stop.

Uh, but when the Coast Guard did approach it in their small boat once again, uh, the four crew members on the go-fast began removing clothing and throwing objects overboard.

The uh, life raft was deployed while the small boat re-positioned to recover the persons in the water.  Three of the go-fast crew members made it onto the life raft safely.

The flare was unsuccessful in fully igniting the go-fast.  A remaining crew member of the go-fast in the water attempted to re-board the go-fast in an effort to re-ignite the fire, but the small boat was able to keep him from climbing back on board.

Uh, the boarding team then secured all four go-fast crew members on board the cutter for medical evaluation.

Uh, it's unknown which of that one crew member was the one that tried to re-ignite and climb back on board the go-fast, but what is clear is -- is, uh, very different from what Mr. Crawford's chain of events in that his client jumped overboard before the pursuit actually occurred.

All four of them jumped out of the vessel at the same time, removed their clothing, started throwing objects overboard, uh, and -- and in essence there's nothing that -- that separates his client, Mr. Crawford's client, as being any less culpable than the others on board that vessel.

And, uh, Mr. Crawford notes that it's a very subtle difference, that we have to have a trained ear.  It's the defense's burden by a preponderance of the evidence to prove that Mr. Liobar Estupinan is less culpable than most other participants.

12

Uh, the Government would argue that he has not done that.  All four crew members were -- aside from the captain, who did receive a one-level -- or a two-level upward departure for his role of captain, uh, all had a -- an equal role in loading the cargo on board the vessel, transporting it across the Pacific Ocean while stopping at refueling stations, and were they to have reached their final destination, then assist in unloading those 118 bales of cocaine.

And, uh, when you consider the amount of cocaine that was involved here, as well as the payment to Mr. Estupinan, which was a [sic] offering of 20,000,000 pesos, uh, a down payment of 10,000,000 pesos up-front, uh, to receive another 10,000,000 in return, that total payment that he was to receive is nearly $8,000, which is a very significant sum of money for, uh, a Colombian fisherman, that, uh -- reviewing all those circumstances, that a minor role is not warranted in this case, Your Honor.

THE COURT: Okay.

Agent, did you debrief any of these people?

SPECIAL AGENT GONZALEZ:  Yes, ma'am.

THE COURT: Everybody?

SPECIAL AGENT GONZALEZ:  Everybody.

THE COURT:  Okay.

In your debriefing of his brother, for example, or any of the co-defendants, was there anything that might distinguish Mr. Liobar Estupinan in some way as far as not participating in throwing the load of bales over, or anything?

SPECIAL AGENT GONZALEZ:  No, Your Honor.  No.  Actually, it shows -- the debriefing show [sic] that everyone participated in the unload of the cocaine, and nobody mentioned that the -- Liobar did not participate in the throwing of the bales overboard.

THE COURT:  Okay.

Were most of the bales thrown overboard?

SPECIAL AGENT GONZALEZ:  I'm not sure of the amount.

THE COURT:  All right.

13

MS. CROFF:  No, Your Honor, actually, uh, the bales -- most of the bales were found on board the go-fast, uh, assuming that's why it was attempted to be set fire.  There was a number of objects, uh, that were thrown overboard –

SPECIAL AGENT GONZALEZ:  Talking more of the radios and the stuff that was just laying around was being thrown overboard as they were being chased.  However, the cargo stayed, because they were trying to set it on fire, hoping to destroy that.

THE COURT:  Okay.

And your debriefing didn't reveal who was trying to set it on fire?

SPECIAL AGENT GONZALEZ:  Oh, no.  Uh-uh. (Shaking head negatively).

THE COURT:  Okay.

All right.  Thank you.

Okay.  Well, anything else anyone would like to say?

[DEFENSE ATTORNEY MR. CRAWFORD]:  One of the advantages of having safety valve is that it requires the defendants to meet with the Government and tell them the truth as to what happened.  My client met with the Government and told the agent that he did not throw any of the bales overboard, [sic] that he did take off a part of his clothing and jump overboard, that he did not shoot the flare gun into the boat, so -- I'm -- I'm -- stuck here with -- with the condemnation of they did this, they did that without making any attempts to make the distinctions.  And we need, to do justice in this case, to make those distinctions to determine whether or not he deserves a minor role.

THE COURT:  Okay.

Maybe I misunderstood, let me ask, did -- did you ask -- rather than telling you what my understanding was, let me just ask.  Did you ask the co-defendants who shot the -- ask each of the co-defendants who shot the flare into the boat?

SPECIAL AGENT GONZALEZ:  No.

THE COURT:  So you didn't ask that question?

14

SPECIAL AGENT GONZALEZ:  No, Your Honor.

THE COURT:  Okay.

Did you ask Mr. Liobar Estupinan that question?

SPECIAL AGENT GONZALEZ:  No, Your Honor.  I didn't -- I use my -- the way that I debrief, I try to let them tell me their -- their story, and I just put it down in the paper.

THE COURT:  Okay.

Did he tell you that he didn't do that?

SPECIAL AGENT GONZALEZ:  No. No, Your Honor.

He did tell me -- he did tell me that he did not -- he did tell me, we did not load the go-fast.  He said, we counted 118 bales, but we did not load the go-fast.  However, I have other debriefings that say we all loaded the go-fast.

THE COURT:  Okay.

(Pause.)

All right.  Well, I can't see anything that distinguishes Mr. Liobar Estupinan from any of the other -- and I agree with you, Mr. Crawford, that's where I need to be looking, is there anything that distinguishes him from any of the other participants on the go-fast boat, and I can't find anything.  Obviously, he's distinguished from his brother, who was the captain, but he got a two-level increase, so.

(Doc. cr-132 at pp. 8-16).

The Court found that Estupinan was not entitled to a minor role because Estupinan's role was no different from the roles of the other three mariners on the go-fast.  The record supports the denial of a minor role reduction; ground two does not warrant relief.

### Ground Three

Estupinan alleges that a departure for extraordinary family circumstances and for collateral consequences due to deportability is warranted.  Estupinan claims that his family

15

is suffering a great hardship without him and:

> relied heavily on him for guidance and financial support.  With the added deterrent of separation of family, the punishment factor is severely increased and the punishment extends to the family. (18 U.S.C. § 3553(b)).  Non deportable inmates' families will not suffer the same circumstances, a factor not accounted for in the sentencing guidelines or at sentencing.  Defendant's 14th Amendment rights are being violated.  The Equal Protection clause is to guarantee that similar individuals are dealt with in a similar manner by the Government.

> Due to the defendant's deportability, he is ineligible for participation or incentives related to the RESIDENTIAL DRUG ABUSE PROGRAM, HALFWAY HOUSE or CCC, MINIMUM SECURITY, or CAMP PRISON, INCARCERATION WITHIN 500 MILES OF FAMILY TIES, and as proven with his current detention, placement in a real BOP facility which has far higher quality food, education, medical, library, rehabilitative programs, higher pay grades (E.I. BOP's UNICOR work program pay upwards of $800 monthly, at CCA (prison for profit), he earns approximately $15-$18 a month) etc.  Aside from being ineligible for all of the above, the differences between BOP and a prison for profit are enormous.  This is a factor beyond Mr. Paredes control, kept silent from the public, yet allowed by law.  These inequalities are just some of the many COLLATERAL CONSEQUENCES DUE TO DEPORTABILITY.  The defendant has a PSF (Public Safety Factor) designation, rendering him ineligible for a minimum security facility, unlike a non deportable inmate, who commits the same offense, who was equally or more culpable and received an identical sentence.

(Amended Motion To Vacate, Doc. cv-4 at pp. 6-7, 13).

Like ground two, this claim is not a 28 U.S.C. § 2255 issue. *See United States v. Lahoud,* 178 Fed. Appx. 926, 928 (11th Cir. 2006). Furthermore, the claim has no merit. The collateral consequences that a defendant faces because he is a deportable alien generally do not support a departure. *Id. See also*, *United States v. Maung,* 320 F.3d 1305 (11th Cir. 2003) (downward departure sentence could not properly be based on desire to shield defendant from immigration consequences of conviction). In *United States v. Restrepo*, 999 F.2d 640 (2d Cir. 1993), the district court relied on collateral consequences stemming from the defendant's status as an alien to support a downward departure.  These

16

collateral consequences included ineligibility for assignment to lower-security facilities; post imprisonment detention pending removal, and removal itself. *Id.* at 644-47. The Second Circuit found that those collateral consequences were insufficient to support a downward department and reversed the downward departure on direct appeal.

Ground three does not warrant relief.

## Ground Four

Estupinan alleges that he entered into a plea agreement under false pretenses. He alleges:

> Defendant entered into a plea agreement waiving his right to appeal. He received 121 months, the same or more than other individuals with similar 10 yr. minimums but who had not entered into a plea agreement. In the majority of cases, even the non-deportable defendants received 2 level departures for a plea agreement and additional 2 level departures for safety valve, halfway house, CCC camp status (BOP facilities), moved within 500 miles of family, education, rehabilitation, drug programs, RDAP, pre-release preparation for reentry into society . . . Defendant is deprived of all these rights afforded to non-deportables and all without jurisdiction.

(Amended Motion To Vacate, Doc. cv-4 at p. 8).

Estupinan's claims are simply not true, specifically that the majority of non-deportable defendants secure a two-level departure for a plea agreement. Estupinan's 121-month sentence is one level less than the advisory guidelines range of 135 to 168 months. In imposing the sentence, the Court considered the 18 U.S.C. § 3553 factors, the nature and circumstances of the offense, the history and characteristics of the defendant, and specifically the fact that Estupinan entered a plea pursuant to a plea agreement in which he waived his right to appeal.

Furthermore, Estupinan's allegation that he received the same sentence as the other Defendants who did not enter into a plea agreement and give up their right to appeal is

17

incorrect. Defendant Soliman, who did not enter into a plea agreement, received a 135-month sentence. (Doc. cr-127).

Estupinan's arguments also fail because Estupinan has not shown the violation of any constitutional right. Estupinan has no due process liberty interest in early release. See, e.g., *Wottlin v. Fleming*, 136 F.3d 1032, 1036 (5th Cir.1998). More generally, inmates do not have any federal constitutional right to participate in rehabilitative programs. Nor does an inmate have any constitutionally protected interest in a particular housing assignment or transfer to a particular prison. *See, e.g., McKune v. Lile* , 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) (no right to incarceration at any particular prison). In sum, Estupinan has not shown that his Fifth Amendment due process rights have been violated. *See also, Moody v. Daggett*, 429 U.S. 78, 88 n. 9 (1976) (Federal prisoners have no due process right to eligibility for rehabilitative programs.); *Murdoch v. Washington*, 193 F.3d 510, 513 (7th Cir.1999) (no protectible liberty or property interest in attending rehabilitation program); *Wishon v. Gammon*, 978 F.2d 446, 450 (8th Cir.1992)(no right to educational or vocational opportunities); *Canterino v. Wilson*, 869 F.2d 948, 952-54 (6th Cir.1989) (no liberty interest in inmate classification or eligibility for work programs); *Hernandez v. Johnston*, 833 F.2d 1316, 1318 (9th Cir.1987) (no right to particular inmate classification or eligibility for rehabilitative programs); *Pugliese v. Nelson*, 617 F.2d 916, 923 (2d Cir.1980) (same); *Battle v. Anderson*, 564 F.2d 388, 403 (10th Cir.1977) ("[A]n inmate does not have a federal constitutional right to rehabilitation."); *Lyle v. Sivley*, 805 F.Supp. 755, 759-60 (D. Ariz. 1990) (holding that Due Process Clause does not give federal prisoners a protected right to participate in drug treatment programs).

18

In *Minh v. United States, 2006 WL 2444085 *3* (S.D. Ga. Aug. 22, 2006), the Court held that BOP's use of BICE detainers in deciding prisoners' eligibility for prison programs and early release did not offend equal protection principles. Courts have routinely upheld the Bureau's consideration of BICE detainers in making classification decisions regarding inmates, including such issues as security level and eligibility for prison programs.

Estupinan's argument that deportable aliens are categorically denied transfers to halfway houses, CCC camp statuts, or drug rehabilitation programs  is also misleading. As the Ninth Circuit has pointed out, the BOP excludes all inmates -- not just aliens -- who are subject to detainers from participation in community-based treatment programs. *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir.1999). The "detainer exclusion," which is based upon the rationale that prisoners with detainers pose an increased flight risk, does not single out aliens and does not violate the Equal Protection Clause. *Id. See, e.g., Franklin v. Berry*, 909 F.Supp. 21, 27-28 (D . D.C.1995)(upholding Bureau's reliance upon detainers in assigning security classifications to aliens); *Limas v. McNary*, 799 F.Supp. 1259, 1263 (D. Mass.1992)(Bureau's decision to deny deportable aliens prerelease transfer to minimum security institutions did not implicate any constitutional right); *Isaraphanich v. Coughlin*, 715 F.Supp. 119, 120-21 (S.D. N.Y. 1989)(Bureau's reliance on detainers to deny aliens access to prison programs did not violate the Equal Protection Clause); *Femandez-Collado v. I.N.S.*, 644 F.Supp. 741, 744 (D. Conn.1986)("Petitioner has neither a legitimate statutory nor constitutional entitlement to those prison programs from which he may be denied access as a result of the detainer."), *afield* 857 F.2d 1461 (2d Cir. 1987).

Estupinan's argument that aliens are categorically denied participation in drug abuse treatment programs is also misleading. The Bureau does not deny aliens participation in

19

substance abuse treatment programs; rather, the Bureau denies aliens subject to BICE detainers consideration for early release on account of their completion of a residential drug abuse treatment program. See 28 C.F.R. § 550.58(a)(1)(I). Of note, the Bureau clearly possesses the power to categorically exclude inmates from consideration for early release. *See Lopez v. Davis*, 531 U.S. 230, 239-44 (2001) (upholding a Bureau regulation categorically excluding, based upon its general discretion under the statute to grant or deny early release, prisoners convicted of otherwise nonviolent offenses that involved use of a firearm). Furthermore, the Bureau may aim such an exclusion at deportable aliens if it has a rational basis for its decision. *See Mathews v. Diaz*, 426 U.S. 67, 77 (1976).

Finally, Estupinan is correct that his deportability prevents him from participating in Federal Prison Industries ("UNICOR") work assignments. See 28 C.F.R. § 345.35(a). Nevertheless, the Bureau clearly has a rational basis for excluding deportable aliens from consideration for rehabilitative programs, including UNICOR assignments. As one court has explained:

> The [Bureau] does not act in violation of Fifth Amendment equal protection standards in providing programs for prisoners who have a lawful right to remain in the country, whose rehabilitation is of interest to this country and the policy of this society, and in not providing programs for deportable aliens who have no right to be in the country and whom Congress has an interest in deterring from entering or returning .... There is no equal protection violation in different treatment of aliens as to rehabilitation and other programs. The United States may treat deportable aliens and citizens differently. There is no primary interest in reformation of deportable persons. That's an interest of the country to which they may be deported . Deterring further illegal reentry is a legitimate interest of the United States as well as saving expenses. Also, special security may be justified to avoid flight to the border. In the case of American citizens, or lawful residents, reformative programs are a worthy correctional consideration.

*Ruiz-Loera v. United States*, 2000 WL 33710839, at *2 (D. Utah June 23, 2000) (citations

omitted); *see also United States v. Tamayo*, 162 Fed. Appx. at 816, 2006 WL 52792, at *3 ("[T]here is a rational basis to deem deportable aliens, who will be sent out of the country after the term of their sentence, ineligible for programs geared toward rehabilitating prisoners who will re-enter society after their release from confinement.").

None of Estupinan's claims in ground four have merit and ground four does not warrant relief.

Accordingly, the Court orders:

That Estupinan's amended motion to vacate (Doc cv-4;cr-136) is denied.  The Clerk is directed to enter judgment against Estupinan in the civil case and to close that case.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Defendant is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Defendant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Defendant has not made the requisite showing in these circumstances.

Finally, because Defendant is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on March 9, 2007.

SUSAN C. BUCKLEW
United States District Judge

AUSA:  Christopher Francis Murray

Pro se:  Liobar Estupinan